IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 9, 2005 Session

## STATE OF TENNESSEE v. RICHARD FRANK D'ANTONIO

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2002-C-1280     J. Randall Wyatt, Jr., Judge**

_____

**No. M2003-03052-CCA-R3-CD - Filed October 26, 2005**

_____

The defendant appeals his conviction for premeditated first degree murder and presents nine issues for review: (1) Sufficiency of the evidence; (2) Failure to dismiss the indictment due to prosecutorial delay; (3) Failure to suppress the defendant's statements; (4) Failure to suppress a crime scene photograph; (5) Admission of hearsay under the state of mind exception; (6) Admission of hearsay under the co-conspirator exception; (7) Admission of conduct and activities by Chuck Dixon with Cashbox magazine; (8) Admission of a tape recording and transcript of the defendant's conversations; and (9) Error in instructing the jury on aiding and abetting. After careful review, we find no reversible error and affirm the defendant's conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined. JOSEPH M. TIPTON, J., concurred in results only.

Ross E. Alderman, District Public Defender, and Jeffrey A. Devasher and Patrick Frogge, Assistant Public Defenders, for the appellant, Richard Frank D'Antonio.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Senior Counsel; Victor S. (Torry) Johnson, III, District Attorney General; and Tom Thurman and Kathy Morante, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The defendant, Richard Frank D'Antonio, was indicted on July 19, 2002, for: (Count One) premeditated first degree murder of Kevin Hughes and (Count Two) assault with intent to commit murder of Sammy Sadler. Both counts stemmed from events that occurred on March 9, 1989, on 16th Avenue South (Music Row) in Nashville. A jury convicted the defendant on both counts, as charged, on September 25, 2003. The defendant was sentenced to life imprisonment for the murder

of Kevin Hughes in Count One. The second count was later dismissed due to violation of the statute of limitations.

The defendant now appeals his conviction and presents nine issues for consideration on review:

1) Whether the evidence was sufficient to support the conviction for premeditated first degree murder;

2) Whether the trial court erred in failing to dismiss the indictment due to pre-accusatorial delay;

3) Whether the trial court properly denied suppression of the defendant's statements to police;

4) Whether a photograph of the victim's body at the crime scene was properly admitted;

5) Whether the trial court erred in admitting numerous hearsay statements and non-verbal hearsay by the victim under the "state of mind" exception;

6) Whether the trial court erred in admitting numerous hearsay statements and non-verbal hearsay by Chuck Dixon under the "co-conspirator" exception;

7) Whether the trial court erred in admitting testimony concerning conduct and activities by Chuck Dixon, relating to Cashbox magazine;

8) Whether the trial court erred in admitting a tape recording and transcript of two telephone conversations between the defendant and prosecution witness, Steve Daniel; and

9) Whether the trial court erred in instructing the jury on the theory of aiding and abetting.

**Factual Background**

At the time of his death, the victim was Chart Director for Cashbox magazine. The victim was hired for this position by the defendant in 1987. The defendant, in 1987, was the Division Manager at Cashbox but was not employed there at the time of the victim's death.

Sharon Pennington, a record promoter for Step One Records in March of 1989, testified that she and the victim were good friends. She stated that they had attended a movie on March 9, 1989, and that she dropped the victim off at his office in the early evening. She said the victim was uncharacteristically "nervous" and "fidgety" that day.

Ms. Pennington said that the Cashbox chart for independent artists was not legitimate and that the victim had been taking steps to make it legitimate and improve its image. She said that Chuck Dixon's control over the independent artists chart at Cashbox was so widely known that the magazine was often derisively called "Chuckbox" by members of the music industry. Ms. Pennington knew Chuck Dixon from her company having hired him as an independent record promoter. She knew the defendant due to his work at Cashbox and he was often with Dixon at meetings with her employers. She recalled that the defendant had a back injury at that time.

-2-

On the day of the victim's death, Ms. Pennington had received two angry phone calls from Dixon asking her to relay messages to the victim. Dixon wanted the victim to restore some stations that had been dropped from those used to compile the charts. She explained that starter or smaller radio stations have a larger play list, making it easier for a promoter to obtain play for particular songs. The victim had dropped several smaller stations in favor of stations with larger listening markets. This caused problems for Dixon in manipulating the selection of songs to be played. After she told the victim about Dixon's calls and that Dixon was upset, the victim responded that he expected Dixon to be upset.

Sammy Sadler was, in March 1989, promoting and recording for Evergreen Records. His promoter was Chuck Dixon. Sadler and the victim were "acquaintances and becoming friends." Sadler met the victim at the Cashbox office on March 9, 1989, and the two went out to eat and then went to Sadler's office at Evergreen Records. The two men left and went to the victim's car which was parked on Sixteenth Avenue South. As Sadler was entering on the passenger side, a man, wearing gloves and a mask and displaying a gun, appeared at Sadler's door. Sadler threw up his arms to protect his head and was shot once. Sadler did not recall making his way to a nearby apartment for assistance. Sergeant Kenny Dyer questioned Sadler that night, and Sadler reported that the assailant was wearing all black clothing and a ski mask. Sadler also thought the assailant was a black male of slender build.

On the night of the murder, two Belmont students witnessed the incident. Robert Lyons, III, was driving down 16th Avenue South; his passenger was Allison Kidd (now Chimento). Lyons witnessed the victim roll out of his car and start running. A man came from the other side of the victim's car and started pursuing the victim, shooting two or three times. The victim fell, and the assailant ran to him and shot the victim three more times. Lyons stated that the shooter had on a black ski mask, black clothing, and held in his right hand a blue-steel revolver. He estimated that the shooter was 5'10" to 6' tall and had a stocky build. Lyons stated that the eye holes in the shooter's mask were large enough for him to see that the shooter was Caucasian. He described the shooter as running with an unusual side-to-side gait. The police responded to a call of a shooting within three minutes.

Allison Kidd Chimento recalled driving down Music Row on March 9th with Bob Lyons a little after 10:00 p.m. when two men ran in front of their car. One man was fleeing from a man dressed in black and a ski mask, carrying a black gun in his right hand. She saw the shooter stand over the fallen victim and fire repeated shots. Mrs. Chimento said the assailant was from 5'9" to 6' tall and overweight in the mid-section. The shooter fled between buildings to the east.

On March 9, 1989, Phillip Barnhart lived in an apartment on Sixteenth Avenue South. He heard shots and looked out his window where he saw two men running down the street in a "zigzagged" fashion until they ran out of his vision. Barnhart thought one man was wearing a ski mask. Sammy Sadler was able to come to Barnhart's apartment, where he collapsed.

Donnie Lowery was in his apartment on Sixteenth Avenue South on the night of the victim's murder. He heard gunshots and looked out his window. He witnessed a man chasing and shooting at another man. When the victim fell, the shooter went to the body and shot another two or three times. The man was shooting with his right hand and, when he ran off, it was with an "abnormal gait," "somewhat like a limp." He said the shooter was 5'10" to 6' tall and had a "stocky build."

Kathy Hunter was visiting Lowery at the time of the shooting. She saw a man running and yelling, being pursued by a man dressed in black. When the victim fell, his pursuer walked up and shot him two or three more times. She stated the assailant was wearing a ball cap, as well as a ski mask. She estimated the assailant's height as 5'10" to 6' and said he was "stocky built."

Officer Charles Anglin, an employee in the Identification Division of Metro Nashville Police Department, was one of the officers who gathered evidence at the scene. Among the items found were a spent projectile found near the victim's head and a ball cap near the victim's right foot. A hair found in the ball cap was submitted to the FBI for analysis. Agent Douglas Deedrick, a hair and fiber expert, testified that the black hair had characteristics of cat hair.

Detective Pat Postiglione interviewed the defendant on March 28, 1989. He described the defendant as cooperative but nervous. The defendant appeared to be in discomfort and complained of back problems. Detective Postiglione observed that the defendant was heavier in March of 1989 than at the trial.

Detective Bill Pridemore was the lead investigator of the victim's murder in 1989. He stated that two projectiles were removed from the victim's body during the autopsy. Those, together with the projectile found at the scene, were submitted for testing, as was a baseball cap found at the scene.

In February of 1993, Detective Pridemore learned that an individual named Steve Daniel had sold the defendant a handgun in 1989. Detective Pridemore interviewed Mr. Daniel and was provided with four spent bullets and one live round of ammunition which Daniel said was similar to that supplied the defendant when the defendant bought the gun. It was Detective Pridemore's understanding that the ammunition was obtained by Daniel after the defendant had purchased the gun.

By April of 2002, Detective Pridemore had been assigned to the cold case files within the Metro Nashville Police Department and was again working on this case. He contacted Steve Daniel and learned that the gun sold to the defendant had been test fired at Daniel's home on March 9, 1989, the day of the defendant's purchase. Detective Pridemore went to the scene of the test firing in Flintstone, Georgia and there recovered thirteen projectiles that were embedded in the ground. These were submitted to the TBI for testing.

In July of 2002, Detective Pridemore went to Las Vegas, Nevada, to escort the defendant back to Nashville after his arrest. The defendant made a statement when he was informed of the murder charge, that it must be about Kevin. At a later date, after the defendant's transfer back to

Nashville, the defendant told Detective Pridemore that he would talk to him about the case if Pridemore could arrange for him to be housed in a private cell.

Detective Pridemore stated that he had measured the defendant in stocking feet and that he was 5'11" tall. He also testified that Chuck Dixon had died in 2001.

TBI Special Agent Tommy Heflin testified as an expert in firearms and ammunition analysis. He stated that the two projectiles removed from the victim's body and the third projectile found at the crime scene were all fired from the same weapon. He identified them as .38 caliber, .357 size wad-cutter lead projectiles, and most probably were reloads. Agent Heflin also examined the thirteen projectiles found at Flintstone, Georgia. Of those, he concluded that one was fired from the same gun barrel that was used to shoot Kevin Hughes. That projectile was also a lead wad-cutter.

Dr. Mona Gretzel Case Harlan-Stevens, a forensic pathologist, performed the autopsy of the victim. She testified that four separate bullets struck the victim's body, and two were recovered. The cause of death was a gunshot wound to the head, and the manner of death was homicide.

Steven Daniel, a convicted marijuana dealer, began cooperating with Georgia and federal officers and became known to the Nashville police. He testified that he had known the defendant since 1985 or 1986 and that they visited in each other's homes. The defendant was at Daniel's home in Flintstone, Georgia on March 9, 1989. Daniel said the defendant arrived unannounced in mid-afternoon and wanted to buy a pistol. Daniel sold the defendant a thirty-eight (.38) pistol and provided reloaded thirty-eight (.38) caliber bullets with the gun. The two men test fired the gun behind Daniel's house. The defendant left Daniel's house between 6:15 and 7:00 p.m. (CST).

Daniel stated that he remembered the date due to the defendant bringing it up in conversation several times later, as well as the defendant's then wife, Carolyn, having made inquiries about that evening. The defendant told Daniel to tell Carolyn that he had not left Daniel's home until after the 11:00 p.m. (EST) news that night. According to Daniel, the drive from his home in Flintstone to Nashville takes about two hours and fifteen minutes.

In 1993, Daniel reported to Georgia authorities that he might have information about a murder case. Daniel had seen a television program on Crime Stoppers concerning Kevin Hughes' murder. The program made reference to the assailant's strange running gait. Daniel had witnessed the defendant run and described it as "a real strange gait . . . more like an animal would run than a person."

At the request of the police, Daniel recorded phone conversations with the defendant. In one conversation, the defendant makes reference to renewed police interest in "when that boy got killed up here . . . out on Music Row" and requests Daniel to say, if asked, that the defendant left Daniel's house after the 11:15 (EST) news that night. Daniel stated that the defendant brought up this date three or four different times in their various conversations. When Daniel asked about the gun he had sold the defendant, the defendant said, "it's gone." Daniel stated that he cooperated with the

-5-

Nashville detectives when contacted again in 2002 and that he showed them the area where he had test fired weapons at his former home in Flintstone.

Gene Kennedy testified that he had been promoting and producing records for twenty-eight years. He stated that he had, until about 1988, promoted to Cashbox magazine. Kennedy was approached by Chuck Dixon, who offered to promote to Cashbox for him in return for a fee of $1500 and a purchase of an ad in Cashbox by Kennedy . Kennedy refused and, for a period of two and one-half to three years, Kennedy's promoted records did not appear on the Cashbox charts. Kennedy believed that, in 1989, the Cashbox charts were controlled by Dixon and the defendant and that the charts lacked legitimacy. Kennedy had lunch with the victim a week before the victim's death and said the victim was acting "very nervous." On cross-examination, it was established that some records promoted by Kennedy in 1989 were charted in Cashbox. He claimed to have no knowledge of this as he had quit following the Cashbox charts.

Tom McEntee served as Division Manager of Cashbox from November of 1985 to April of 1987. He had hired the defendant to assist with the charts. When McEntee left Cashbox, the defendant took his place. McEntee said the defendant was friends with Chuck Dixon and had gone to work with Dixon when the defendant left Cashbox in 1988 or 1989. McEntee explained that charts could be manipulated either by false reporting from radio stations controlled by an interested person, e.g., a promoter, pocket stations, or could simply be altered by the person compiling the charts.

Robert Metzger testified pursuant to a use immunity agreement with the district attorney. He had worked as a producer and promoter since 1971. He testified that, in the late 1980's, Cashbox's chart was the only exposure independent artists had in the Nashville music community. He said that the defendant was then in charge of Cashbox. In order to have a song charted, it was required that you hire Chuck Dixon and buy an ad in Cashbox. Initially, Metzger's clients paid the defendant this fee, although Metzger was aware Dixon received part of the money. The minimum amount of money for six or seven weeks on the chart was $2500. Metzger illustrated the illegitimacy of the system by recounting that after a payment by his client, there was a problem with manufacturing the record. Nevertheless, the record, "Gal from San Antone," appeared on the Cashbox chart before a single copy was available for play or sale.

Metzger had seen the victim at a radio seminar shortly before the murder. There he observed the victim and Chuck Dixon having a heated argument. Metzger was unable to hear the words exchanged but said that Dixon was trying to give the victim money and that the victim repeatedly refused to accept it. After this incident, Metzger had a meeting with the defendant and Chuck Dixon. One of Metzger's artists was about to release two more records and was preparing to pay $15,000 to have the records charted and to keep them charted for an extended time. Metzger expressed his concerns to Dixon in the following manner:

Metzger:    I told him, I said, Chuck, you know, I saw you and Kevin having this big argument out at the Radio Seminar. And I said, you know, he's already dropped some of your pocket stations, which weakens your

ability to keep a record in for a long time.  And I know he's about to drop a bunch more of your pocket stations.  And I said, Chuck, I'm not going to, you know, give you this fifteen thousand dollars unless I know for a fact you can handle Kevin Hughes.

Assistant DA: Did you also explain to him something that you had heard?

Metzger: I did, General.  I said, you know, the rumor is all over Music Row is that Kevin is going to go to the media and expose this chart fixing scheme you guys are working at Cashbox.  And I said, you know, if he does that, you know, this is going to look very bad on me and my clients and everybody involved in this.

Dixon responded that he was aware of the rumor and said, "I will handle Kevin Hughes.  And if I, you know, can't handle him, he'll be gone."  The defendant was present during this conversation.  Upon receiving those assurances, the $15,000 was paid, plus an advertisement taken in Cashbox magazine.  In return, the artist's release was the highest charted independent record, and he was named Cashbox Male Vocalist of the Year.  Metzger clarified that the defendant was not employed at Cashbox during the time of the foregoing conversation but that he had become partners with Chuck Dixon.

Steve Hess was hired at Cashbox by Chuck Dixon as an assistant chart director a few weeks before the victim's death.  After the victim's death, Hess assumed the duties of chart director and was trained by the defendant.  Hess did not know whether Dixon was employed by Cashbox, but the owner of the magazine, George Albert, had made it clear that Dixon was in charge.  Dixon did not maintain an office at the Cashbox site but was frequently in the Cashbox office.  Hess was not instructed to manipulate the charts and, to his knowledge, they were compiled legitimately during his tenure.

Gary Bradshaw worked as a music promoter in 1989.  He had known the victim, and the victim had expressed his dissatisfaction with his job at Cashbox and an intent to leave his job.  About three months after the victim's death, Bradshaw was contacted by Chuck Dixon and agreed to work with him.  He learned that the Cashbox charts were illegitimate.  A chart position could be acquired by hiring Chuck Dixon for $1500 to $2000 and by paying Cashbox for an advertisement costing $750.  Bradshaw testified that Dixon had control over the reporting of over half the 125 stations that reported to Cashbox.  Those controlled were known as pocket stations.

The defendant was working for Dixon when Bradshaw came to work at Cashbox, but Bradshaw was unaware of any duties performed by the defendant.  Bradshaw stated that when Dixon would become angry with someone, he would comment that their fate could be the same as Kevin's.  Bradshaw stated that he saw firearms in the Cashbox office and that Dixon carried a weapon. The first time Bradshaw met Dixon, two of Dixon's "henchmen" frisked Bradshaw.

Sharon Corbett worked in the same building which housed Cashbox in 1989 and was a good friend of the victim.  She testified that the victim had become unhappy with his job and was thinking

of resigning. She also knew the defendant and said that he favored his hip to the point it was noticeable when he walked.

Cecilia Bragg was hired as a receptionist at Cashbox in 1987. She knew the victim, Chuck Dixon, and the defendant. She said that Dixon came to Cashbox regularly. She noted that the defendant had a bad back and limped. Immediately before the victim's murder, she said the victim seemed to be concerned and upset.

Sandra Daens worked at Cashbox in May of 1987. She had overheard the defendant tell others that chart positions could be acquired for the price of an advertisement in the magazine. She said Chuck Dixon was a frequent visitor with the defendant at Cashbox. She was fired by the defendant in September of 1987.

Mara Langlois, an investigator with the Davidson County District Attorney's office, served a search warrant at the home of Chuck Dixon in January of 2001. Two payment books containing names and dollar amounts were seized. One book's entries began in 1987 and ended in 1988 (orange book). Another book's entries began in 1990 and ended in 2000 (red book). No records were recovered from the period from October 1988 through 1989. The total amount of the payments in 1988 was $138,757.09. There were five payments from the defendant in 1988, totaling $3499. No payments from the defendant were reflected after 1988. The 1990 payment total was $295,796.97, and the total for 1990 through 2000 was $2,188,787.05. Dixon's rolodex contained the defendant's Las Vegas telephone number.

Carolyn Cox had been married to the defendant from 1986 until July of 1989. She testified that the defendant earned $13,000 per year when employed at Cashbox. After leaving, the defendant started an artist development business and worked with Chuck Dixon. After leaving Cashbox, the defendant acquired two houses, three cars, a grand piano, and a motorcycle.

Ms. Cox stated that on March 9, 1989, the defendant was not at home when she went to bed between eleven p.m. and twelve o'clock midnight. She was awakened by a phone call from Chuck Dixon at 3:00 a.m. She told Dixon that the defendant was not at home. After she had hung up the phone, the defendant appeared and asked who had called. The defendant told her he had been at Steve Daniel's house. Later, the defendant instructed her to tell police investigators that he was at home on the night of the victim's murder. Ms. Cox stated that during their marriage, the defendant suffered from a hiatal hernia and a bad back. She also said that they owned a black cat in 1989. She further testified that the defendant was right-handed.

**Sufficiency**

The defendant contends that the evidence is insufficient to support his conviction for premeditated first degree murder. Specifically, the defendant argues that the circumstantial evidence of this case does not exclude every reasonable hypothesis except that of the defendant's guilt.

The standard for an appellate court reviewing a sufficiency challenge is "whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002); see also Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999). Because a verdict of guilt removes the presumption of innocence and imposes a presumption of guilt, the burden shifts to the defendant upon conviction to show why the evidence is insufficient to support the verdict. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). On appeal, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom. State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000); see also Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599.

A verdict of guilt by the trier of fact resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court does not re-weigh or re-evaluate the evidence." Evans, 108 S.W.3d at 236 (citing Bland, 958 S.W.2d at 659). Nor may this court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. Evans, 108 S.W.3d at 236-37.

A crime may be established by circumstantial evidence alone. See State v. Tharpe, 726 S.W.2d 896, 899-90 (Tenn. 1987); State v. Bigsby, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000). However, before an accused may be convicted of a criminal offense based only upon circumstantial evidence, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971). In other words, a "web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Id. at 613; see also Bigsby, 40 S.W.3d at 90.

In March of 1989, the statutory definition of first degree murder in pertinent part read as follows:

39-2-202 (1988). First degree murder.

(a)(1) Every murder perpetrated by means of poison, lying in wait, or by other kind of willful, deliberate, malicious, and premeditated killing, or committed in the perpetration of, or attempt to perpetrate, any murder in the first degree, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or the unlawful throwing, placing or discharging of a destructive device of bomb, is murder in the first degree.

By way of establishing a motive, the State produced evidence that the defendant was in league with Chuck Dixon to control the independent artists' chart at Cashbox magazine. This control of access to artists' public exposure enabled Dixon and the defendant to profit as promoters.

There was ample proof adduced that the victim was perceived as a threat to Chuck Dixon and the defendant's control of the charts at Cashbox. This, in turn, would drastically affect Dixon and the defendant's lucrative scheme of effectively forcing artists to hire them as promoters for access to the only chart for independent artists in the Nashville music community.

Gene Kennedy, an experienced music promoter and producer, stated that Dixon and the defendant controlled the Cashbox charts in 1989. Access to the charts required having Dixon as a promoter and subscribing for an advertisement in the magazine.

Another promoter/producer, Robert Metzger, stated the Cashbox charts were the only exposure independent artists had in the Nashville music community during the late 1980's. He stated that artists were required to hire Dixon as a promoter, plus buy an advertisement from Cashbox, in order to get a song charted. Some of Metzger's clients paid the defendant directly for these services. Metzger confronted Dixon over a rumor that the victim was about to expose the fraud at Cashbox and was told by Dixon that the victim would be handled or would be gone. The defendant was, at that time, a partner of Dixon's.

Gary Bradshaw worked with Dixon after the victim's death and confirmed that the dual requirements of hiring Dixon and of taking an ad at Cashbox for chart position persisted after the death of the victim.

Sharon Pennington, a music promoter and a friend of the victim, received two angry calls from Dixon on the day of the victim's murder. Dixon instructed her to relay his dissatisfaction with the victim's changes on chart compilations. She said the victim was uncharacteristically nervous that day and responded that he expected Dixon to be unhappy. Ms. Pennington was also aware of the defendant's business relationship with Dixon.

The victim's actions of changing the method of compiling charts for Cashbox and the possibility of an impending exposure of the fraud would have had drastic consequences for Dixon's and the defendant's lucrative business practices, providing ample motive for either man to eliminate this threat.

Steve Daniel's testimony narrowed the focus more sharply on the defendant. Daniel testified that on the day of the murder, the defendant came to Daniel's home, located just outside of Chattanooga, to purchase a gun. The men test fired the .38 revolver that the defendant purchased. Daniel also supplied the defendant with reloaded wad-cutter ammunition for the gun. A projectile was found at the test firing site matching the fatal projectiles that killed the victim, providing proof the bullets were fired from the same gun. The defendant had left Daniel's home with sufficient time to be in Nashville at the time of the victim's murder. The defendant had on several occasions asked

Daniel to lie regarding the defendant's time of departure, in order to create an alibi. Carolyn Cox, the defendant's wife in 1989, confirmed that the defendant was not at home between 11:00 p.m. and 12:00 midnight when she retired, although he had instructed her to tell police that he was at home. She also related that Chuck Dixon called their residence at 3:00 a.m. that morning and asked for the defendant.

The victim's assailant wore a ski mask precluding positive identification, but the eyewitnesses described him generally as from 5'9" to 6' in height with a stocky or heavy build. The most striking characteristic observed by the eyewitnesses was the assailant's unusual gait when running. The gait was described as "abnormal," "side to side," and "somewhat like a limp." A number of the defendant's acquaintances described him as favoring his back or hip and as affected by a limp. Steve Daniel had witnessed the defendant run and said it was "a real strange gait" and "more like an animal." The defendant's former wife, Carolyn Cox, stated the defendant suffered from a hiatal hernia and a bad back.

Of lesser consequence, the assailant left a ball cap at the crime scene. A black hair, characteristic of cat hair, was found in the cap. The defendant and his wife owned a black cat in March of 1989, according to Carolyn Cox.

Although the State's evidence was entirely circumstantial, it proved a motive, acquisition and possession of the gun that fired the fatal shots, opportunity, and the defendant's efforts to fabricate an alibi through Steven Daniel and Carolyn Cox. The description of the masked shooter, by all witnesses except Sammy Sadler, matched the defendant.

The defendant's statements to officers after his arrest were admittedly subject to different interpretations. However, a jury would be entitled, in the light of all other evidence, to accept the defendant's remarks as an admission of guilt.

We are mindful of our responsibility in reviewing convictions acquired solely by circumstantial evidence and are guided by our supreme court's admonition in Crawford, 470 S.W.2d at 613:

> In order to convict on circumstantial evidence alone, the facts and circumstances must be so closely interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone. A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt. Mere suspicion and straws in the wind are not enough for circumstances take strange forms.

The defendant argues that evidence of guilt points equally to Chuck Dixon, Steve Daniel, or an unknown assailant. We do not agree. The evidence strongly indicates that the murder occurred with Dixon's knowledge, but the totality of circumstances, in our view, points directly at the defendant and supports the jury's verdict of the defendant's guilt.

-11-

**Pre-Accusatorial Delay**

The defendant filed a pre-trial motion to dismiss the indictment due to the thirteen-year delay between the commission of the offense and the return of the indictment. The defendant contended that he had suffered actual prejudice due to the delay and that the State had caused the delay to gain a tactical advantage. The motion to dismiss was denied, and the defendant now appeals the issue as violative of due process under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, §§ 8 and 9 of the Tennessee Constitution.

The murder of Kevin Hughes occurred on March 9, 1989, and an immediate investigation was undertaken. In 1993, the police learned that Steve Daniel had sold a gun to the defendant in 1989. In 2002, Daniel was re-interviewed, and the police learned that the weapon provided to the defendant had been test fired at Daniel's Georgia home in 1989. Officers went to the site of the test firing and recovered thirteen projectiles from the area. One matched the bullets recovered from the victim. Based on this evidence, an indictment was obtained charging the defendant with murder. According to Detective Pridemore, police had lacked enough evidence prior to this discovery to make formal charges.

In an effort to show prejudice, the defendant adduced testimony at the pre-trial motion showing that an alternative suspect theory had been pursued in 1989. This investigation was done by a patrol officer independent of the homicide unit. Numerous tape-recorded interviews were conducted in that investigation. These recordings were no longer available by the time of the defendant's indictment. Acting as an informant for Georgia and federal officials, Steve Daniel had recorded several phone conversations with the defendant. These, also, were no longer available. The defendant's attorneys made efforts to examine court records in Alabama concerning Steve Daniel for possible impeachment but were informed that the files had been lost or could not be located.

The defendant strongly urges this court to apply the holding of State v. Gray, 917 S.W.2d 668 (Tenn. 1996), as the standard concerning pre-accusatorial delay. Our review of the history of pre-accusatorial delay and the cases subsequent to Gray lead us to reject the defendant's argument.

This court in State v. Dykes, 803 S.W.2d 250 (Tenn. Crim. App. 1990), addressed the due process concerns of delay between the commission of a crime and the commencement of adversarial proceedings. In Dykes, we cited with approval the rule enunciated in United States v. Marion, 404 U.S. 307, 92 S. Ct. 455 (1971); "[t]he Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay . . . caused substantial prejudice to the appellee's rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." Id. at 324; Dykes, 803 S.W.2d at 255.

In an earlier case, Holquist v. State, 489 S.W.2d 88 (Tenn. Crim. App. 1972), this court used the rule in Marion to observe:

> While there is no constitutional right to be arrested, . . . courts have recognized that
> an unreasonable delay between the commission of the offense and the arrest may

violate the defendant's constitutional rights if the delay results in prejudice to him or was part of a deliberate, purposeful and oppressive design for delay.

Holquist, 489 S.W.2d at 93.

The rule stated in Dykes is as follows:

Before an accused is entitled to relief based upon the delay between the offense and the initiation of adversarial proceedings, the accused must prove that (a) there was a delay, (b) the accused sustained actual prejudice as a direct and proximate result of the delay, and (c) the State caused the delay in order to gain tactical advantage over or to harass the accused.

Dykes, 803 S.W.2d at 256.

In Gray, our supreme court dealt with a forty-two-year pre-accusatorial delay. The facts of Gray showed that the State was unaware of the commission of the alleged crime during this period. The court in Gray held that the Marion-Dykes' approach was extremely one-sided and stated, "It places a daunting, almost insurmountable, burden on the accused by requiring a demonstration not only that the delay has caused prejudice but also that the State orchestrated the delay in order to obtain a tactical advantage." Gray, 917 S.W.2d at 673.

The Gray court then articulated the following standard: "In determining whether pre-accusatorial delay violates due process, the trial court must consider the length of the delay, the reason for the delay, and the degree of prejudice, if any, to the accused." Id. at 673. The court upheld the trial court's dismissal of the indictment in Gray, holding that prejudice had been established and that prosecution "would violate the concepts of fundamental fairness and substantial justice embodied in the due process clause of the Fifth and Fourteenth Amendments of the United States Constitution as well as Article I, § 8 of the Tennessee Constitution." Id. at 674.

In State v. Utley, 956 S.W.2d 489 (Tenn. 1997), our supreme court dealt with a case involving a five-year delay from the time the State had knowledge of the offense until commencement of prosecution. The Utley court limited the test used in Gray to cases in which the State was unaware of the offense during an intervening delay. The Court held that although a five-year delay triggers a due process analysis, the standard remains that as set forth in Marion and Dykes. Id. at 495. That is, that the defendant must prove actual prejudice, it will not be presumed and the defendant must also prove the State's delay was to gain tactical advantage. Id.

The case of State v. Carico, 968 S.W.2d 280 (Tenn. 1998), reaffirmed the Marion-Dykes standard when the State was aware of the commission of the offense during the delay. The court in Carico held that a delay of seven years was excessive but that the defendant had proven neither prejudice nor use of the delay by the State for tactical advantage. Id. at 286.

In overruling the defendant's motion to dismiss, the trial court found that actual prejudice had not been proven; that the missing tapes and witness statements may have supported an alternative theory as to the perpetrator, but was not proven. The trial court further found that the

-13-

State had not caused the delay for tactical advantage but instead had lacked sufficient evidence until the discovery of the projectiles.

We conclude that the delay of thirteen years between the offense and indictment in this case is excessive and triggers a careful review for possible due process violations. That being said, the burden on the defendant to satisfy the two remaining prongs of the Marion-Dykes standard remains daunting. "'[T]ime's erosion of exculpatory evidence and testimony 'can rarely be shown[,]' and further 'excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify.'" Carico, 968 S.W.2d at 285 n.5 (quoting Doggett v. United States, 505 U.S. 647, 656, 112 S. Ct. 2686 (1992)). However, we are instructed by Utley, 956 S.W.2d at 495, that "potential forms of prejudice cannot be presumed and instead must be substantiated by the defendant."

The defendant, in an attempt to show actual prejudice, invites the court to speculate that the missing witness tapes and statements would possibly contain exculpatory evidence favorable to the defendant. That is not an option that we are either inclined or allowed to indulge. We agree with the trial court that the defendant has failed to prove actual prejudice resulting from the pre-accusatorial delay.

Further, we conclude that there is no credible proof that the State intentionally caused a thirteen-year delay in prosecuting the defendant in order to gain a tactical advantage. We agree with the trial court that the State adequately explained the reason for the delay in prosecution. Accordingly, the defendant has failed to show that the delay was designed to gain tactical advantage. The motion to dismiss the indictment for due process violations was properly overruled.

### Defendant's Statements

In the defendant's next issue, he asserts error by the trial court in denying a motion to suppress two statements made by the defendant. The first statement was made in Las Vegas after the defendant's arrest by Nevada officers. Detectives Pridemore and Postiglione from Metro Nashville Police, along with Assistant District Attorney General Thurman, met with the defendant in Las Vegas. General Thurman briefly spoke to the defendant, outlining the charges he was facing and the possible sentencing range, including the death penalty. As General Thurman was leaving the room, the defendant stated that when he was arrested, he knew it had to be about Kevin.

The defendant contends that this statement was the result of custodial interrogation, or its functional equivalent, without the benefit of warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966). The State concedes that the defendant was in custody and had not yet been given Miranda warnings but maintains that the statement was spontaneous and not the result of interrogation.

-14-

The trial court found as follows:

After considering the testimony and the video tape of the Las Vegas meeting, the Court does not find that the communications with the Defendant in this case involved statements that the officers or General Thurman should have known were likely to elicit an incriminating response.

The Court is of the opinion that the officers and General Thurman simply advised the Defendant of the charges and the possible range of punishment.

A trial court's findings of fact on a motion to suppress evidence will be upheld unless the evidence preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). "The prevailing party in the trial court is afforded the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from the evidence." State v. Carter, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998)). This court reviews de novo the trial court's application of the law to the facts, without according any presumption of correctness to the trial court's conclusions of law. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001).

The right against self-incrimination is protected both by the United States Constitution, Article V, and the Tennessee Constitution, Article I section 9. To protect these rights, certain procedural safeguards of advising an individual in custody before interrogation are required. See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966). Statements made during custodial interrogation without the benefit of Miranda warnings are inadmissible in court. See Dickerson v. United States, 530 U.S. 428, 120 S. Ct. 2326 (2000). Miranda warnings are required only when the defendant is in custody and is subjected to questioning or its functional equivalent. See Rhode Island v. Innis, 446 U.S. 291, 100 S. Ct. 1682 (1980). In Innis, the Supreme Court elaborated on "interrogation" for Miranda purposes:

"[I]nterrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

Id. at 301-02 (footnotes omitted).

-15-

The defendant cites State v. Sawyer, 156 S.W.3d 531 (Tenn. 2005), as support for his position. We view Sawyer as distinguishable from the instant facts. In Sawyer, an aggravated sexual battery case, the defendant was taken handcuffed into a detective's office and was read the detailed allegations of the affidavit in support of the arrest warrant. Sawyer responded by admitting to rubbing the victim's leg but denied vaginal contact as alleged in the affidavit. Under the totality of the circumstances, our supreme court affirmed the trial court's suppression of the defendant's statement as the reading of the damning specifics of the affidavit was likely to elicit a response.

The defendant's statement in this case was not directly responsive to the charges and were unforeseeable results of stating the crime charged and the possible range of punishment. The defendant's response is even subject to an innocent interpretation as opposed to being strictly incriminating. We agree with the trial court that under the totality of circumstances, the defendant was not justified in perceiving this explanation as an interrogation.

The second statement by the defendant, which was sought to be suppressed, was made after the defendant's extradition to Nashville. Detective Pridemore was escorting the defendant into the booking room, and the defendant began making inquiries as to whether his medicines were available and where he would be housed in the jail. Detective Pridemore told the defendant that he would probably be housed in the general population. The defendant then said words to the effect of, "I'll tell you about the case if you'll give me a private room." Detective Pridemore responded that it was too late, and no further statements were made by the defendant.

In the trial court's order denying the defendant's motion to suppress, the trial court held as follows:

> The Court is also of the opinion that the communication from Detective Pridemore to the defendant, which occurred after they arrived in Davidson County, was in response to questions from the defendant regarding his medication and housing arrangements. For these reasons, the court does not find that the statements made by the defendant were elicited, nor did they constitute an interrogation.

As noted before, the trial court's findings of fact are conclusive on appeal unless the evidence preponderates against those findings. Odom, 928 S.W.2d at 23. The application of the law to the facts is reviewed de novo with no presumption of correctness, and cases involving mixed law and fact questions are also subject to de novo review. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

It is undisputed that the defendant, at the time of this statement, was in custody and had invoked his right to counsel. Thus, our sole focus is to determine whether the statement in question was made in response to improper police interrogation.

The Supreme Court in Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S. Ct. 1880 (1981), stated: "We further hold that an accused . . . , having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been

-16-

made available to him, <u>unless the accused himself initiates further communication, exchanges, or conversations with the police</u>." (emphasis added).

We agree with the trial court that the defendant's spontaneous offer to talk about the case in exchange for a private cell was neither initiated by the officer nor was it interrogation.

## Crime Scene Photograph

The defendant asserts that the trial court erred in admitting a photograph of the victim's body at the crime scene. The picture, which was displayed at trial on an overhead projector, shows the victim's body outstretched on the pavement where he was fatally shot. The victim's torso is exposed, and his pants are open just below the navel. A large pool of blood had accumulated to the right of the victim, and the location of a spent projectile is marked. The trial court, after a jury-out hearing, allowed the photograph in order to show the crime scene and the location of the projectile.

The defendant maintains that the photograph was not relevant to any contested issue at trial and, secondly, if found relevant, its probative value was substantially outweighed by the danger of unfair prejudice.

Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. <u>See</u> <u>State v. Banks</u>, 564 S.W.2d 947, 949 (Tenn. 1978) (citations omitted). Accordingly, "the admissibility of photographs lies within the discretion of the trial court" whose ruling "will not be overturned on appeal except upon a clear showing of an abuse of discretion." <u>Id.</u> Notwithstanding, a photograph must be found relevant to an issue at trial with its probative value outweighing any prejudicial effect before it may be admitted into evidence. <u>See</u> <u>State v. Vann</u>, 976 S.W.2d 93, 102 (Tenn. 1998). Photographs of a corpse are generally admissible in murder prosecutions if they are relevant to the issues at trial. <u>Banks</u>, 564 S.W.2d at 950-51; <u>see</u> Tenn. R. Evid. 403. Notwithstanding this broad interpretation of admissibility, evidence that is not relevant to prove some part of the prosecution's case should not be admitted solely to inflame the jury and prejudice the defendant. <u>Banks</u>, 564 S.W.2d at 951.

In keeping with our state's policy of liberality in the admission of photographs, we conclude that the photograph in question was probative in demonstrating the nature and extent of the injuries of the attack and of showing premeditation. The photograph itself, in comparison to other crime scenes, is not particularly gruesome or excessively morbid to the point of serving to inflame the jury. Accordingly, we conclude that the trial court did not abuse its discretion in the admission of the crime scene photograph.

## Hearsay

Next, the defendant contends that the trial court erred in admitting certain hearsay statements and "nonverbal hearsay" by the victim under the state of mind hearsay objection.

-17-

Sharon Corbett testified that the victim was thinking of quitting his job at Cashbox, that he was feeling a lot of pressure, and that he was unhappy and wanted to visit his parents.

Gary Bradshaw said that the victim talked about going back home and that the victim had enough of Cashbox.

Kyle Hughes, the victim's brother, testified concerning a phone conversation with the victim on the evening of his death, wherein the victim seemed nervous and almost scared. The victim said there were things he needed to discuss in person. The victim told his brother he loved him, which he had never said on the phone.

Sharon Pennington testified to telling the victim, on the day of his death, about two calls she had received from Chuck Dixon that day. She said the victim replied that he expected Chuck to be upset and that the victim appeared nervous, anxious, and, obviously, a little bit intimidated.

Sandra Daens testified that the victim had expressed suspicion that the Cashbox charts were being changed in his absence. The trial court cut this testimony short. Ms. Daens then testified that the defendant acted afraid.

The defendant argues that the above testimony was not relevant because the victim's state of mind was not directly probative of whether the defendant committed murder. In addition, the defendant points out that the state of mind hearsay exception (Rule 803.3) is only accessible to prove the declarant's conduct and not a third party's conduct. Finally, the defendant contends that the admission of this hearsay violated the recent decision of Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004).

Tennessee Rule of Evidence 803(3), as a state of mind hearsay exception, states in pertinent part: "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health)" may be admitted as an exception to the hearsay rule. The Advisory Commission Comments make it clear that the rule contemplates the declarant's conduct and not a third party's conduct.

The defendant correctly contends that the victim's state of mind was not probative of whether the defendant killed the victim. However, the defendant further contends that the State did not seek to use this evidence to prove any conduct of the victim. We disagree. The hearsay statements at issue show the victim's discontent with his situation at Cashbox and his intent to leave his employment there.

The evidence is relevant for the potential implications on the chart-fixing conspiracy by the departure of a troubled and discontented employee with insider knowledge. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Once the court concludes the evidence is relevant, the court should exclude the evidence if its

probative value is substantially outweighed by its prejudicial effect. Tenn. R. Evid. 403; State v. James, 81 S.W.3d 751, 757 (Tenn. 2002). A trial court's decision as to the relevance of evidence under Rule 401 will be reversed only upon a showing of abuse of discretion. State v. Powers, 101 S.W.3d 383, 395 (Tenn. 2003).

We therefore conclude that the victim's expressions of feeling pressure, unhappiness with his job at Cashbox, and suspicion of wrongdoing were all indicative of the victim's state of mind at the time of expression. The victim's expressions of intent to leave Cashbox would likewise be admissible hearsay as indicative of his intent. The witnesses' observations that the victim seemed nervous, upset, or intimidated are not hearsay but are the witnesses' own subjective characterization of the victim's behavior. We do not believe Crawford to be applicable to the instant testimony. The holding therein forbade testimonial evidence unless the declarant was unavailable and there had been a prior opportunity to cross-examine. We do not characterize the victim's statements at issue as testimonial in nature.

### Hearsay Statements by Dixon

In the defendant's next issue, he argues that the trial court erred in admitting certain hearsay statements by Chuck Dixon under the co-conspirator exception. Specifically, the defendant contends that the State failed to prove a conspiracy existed between the defendant and Dixon and that the statements at issue were not made in furtherance of a conspiracy. Furthermore, the defendant argues that the statements are barred by Crawford v. Washington.

One of the numerous exceptions to the hearsay rule is "a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy." See Tenn. R. Evid. 803(1.2)(E). In order for a statement to be admissible under this exception, the prosecution must establish: (1) evidence of the existence of a conspiracy and the connection of the declarant and the defendant to that conspiracy; (2) that the declaration was made during the pendency of the conspiracy; and (3) that the declaration was made in furtherance of the conspiracy. See State v. Henry, 33 S.W.3d 797, 801-02 (Tenn. 2000). These must be established by a preponderance of the evidence. See State v. Stamper, 863 S.W.2d 404, 406 (Tenn. 1993). Proof of the conspiracy may be circumstantial, based on the conduct of the parties. See State v. Alley, 968 S.W.2d 314, 316 (Tenn. Crim. App. 1997). "[A] conspiracy is, in general terms, a combination of two (2) or more persons, by concerted action, to accomplish some criminal or unlawful purpose." State v. Walker, 910 S.W.2d 381, 384 (Tenn. 1995).

We begin our analysis by a review of the evidence relied upon by the State to establish a conspiracy by Dixon and the defendant. Tom McEntee testified that the defendant replaced him as division manager at Cashbox in April of 1987 and was there until 1988 or 1989 when the defendant left Cashbox to work with Chuck Dixon. Sharon Pennington stated that Dixon controlled Cashbox despite not being an employee and that his control was so well publicized that the magazine was called "Chuckbox" in the music community. She also knew the defendant had a business

relationship with Dixon. Gene Kennedy stated his belief that Dixon and the defendant controlled the Cashbox charts and related the requirements of Dixon to obtain a chart position.

Richard Metzger confirmed the details of the requirements of hiring Dixon and subscribing for a Cashbox ad in order to be charted. He stated that some of his clients paid the defendant directly and that Dixon shared in the money. When Metzger expressed his concerns about the victim potentially causing problems with the charting methods, Dixon assured him, in the defendant's presence, that the victim would be handled or would be gone. The defendant was at that time a partner with Dixon, although not a Cashbox employee. Carolyn Cox, the former wife of the defendant, testified as to the dramatic increase of the defendant's standard of living after the defendant left Cashbox and began working with Dixon.

Other witnesses testified as to the close association of Dixon and the defendant. Some examples of the manipulation of the Cashbox charts were so blatant as to be farcical. Sammy Sadler, who was promoted by Dixon, was nominated for Independent Male Vocalist of the Year despite having no records or artistic appearances. Robert Metzger recounted another artist's song which made the charts before the record was ever manufactured. It, too, was promoted by Dixon. Sandra Daens, a Cashbox employee, had heard the defendant tell promoters or artists that buying a Cashbox ad would move their record up on the charts.

Our review of the evidence leads us to conclude that the State, by a preponderance of the evidence, established that Dixon and the defendant engaged in a conspiracy to manipulate the Cashbox charts for their personal gain. We must now examine the defendant's contention that the particular statements were not made in the course of and furtherance of the conspiracy.

The defendant contends that the statements made by Dixon in his two phone calls to Sharon Pennington on the day of the victim's murder were not in furtherance of a conspiracy to either manipulate the charts or to murder the victim. We strongly disagree. The object of Dixon's call was to dissuade the victim from changing the chart system and deleting the pocket stations. The conspiracy to murder can be seen as a subset to the goal of maintaining the illegitimacy of the chart system that sustained the conspirator's illegal enterprise. It is immaterial that the defendant was not a party to the conversation. Once the conspiracy is established, it is unreasonable to expect that the parties to the conspiracy will act together on each step of furtherance. The same would apply to Dixon's statement to Metzger that the victim would be handled or be gone. It is fundamental to this hearsay exception that Dixon spoke for the defendant, as in an agency relationship.

However, the statement by Dixon to Bradshaw that certain people could suffer the same fate as the victim is less obvious as furthering the conspiracy. The objects of Dixon's anger were not present, and the statement seems to be more in the nature of foolish boasting than assisting the conspiracy. In light of the weight of the other evidence, we deem it as harmless error.

As for the contention that the co-conspirator statements violate Crawford v. Washington, we do not agree. That holding would disallow admission of a witness's testimonial statements unless

he was unavailable and the defendant had been given an opportunity for cross-examination. Crawford, 541 U.S. at 60. The statements at issue are clearly not testimonial in nature and would not be subject to the same strictures.

## Dixon's Relationship to Cashbox

The defendant next asserts that the trial court erred in admitting testimony concerning the business and conduct of Chuck Dixon, relating to Cashbox magazine and the music industry. The defendant asserts that the evidence was irrelevant and unduly prejudicial because it tended to show the guilt of the defendant based merely on association.

In this issue, the defendant argues that the testimony given by Gary Bradshaw, Sammy Sadler, Gene Kennedy, Sharon Pennington, Richard Metzger, and Mara Langlois, concerning the business practices of Chuck Dixon, were erroneously admitted. The defendant's assertion of irrelevance has been previously addressed in that these practices were the actions of a co-conspirator with the defendant and probative of the conspirators' motives.

As the major figure in the scheme to profit from the manipulation of the Cashbox charts, it was natural that Dixon was the focus of much of the evidence. It is no less true that the evidence established that the defendant was in league with Dixon, albeit in a subordinate capacity.

The defendant's reliance on Tennessee Rule of Evidence 403 is misplaced. Rule 403 requires exclusion of evidence, even when relevant, if the "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste or needless presentation of cumulative evidence." Tenn. R. Evid. 403. We conclude that the evidence at issue is not unfairly prejudicial nor does it share any of the other negative factors contained in the Rule.

## Tape Recordings

Next, the defendant asserts that the trial court erred in admitting a tape recording and transcript of two phone conversations between the defendant and Steve Daniel.

The defendant first argues that the recording is inaudible to the degree that it is irrelevant under Tennessee Rule of Evidence 401 and unfairly prejudicial under Tennessee Rule of Evidence 403. In addition, the defendant contends that the jury should not have been furnished a transcript as it, combined with the poor audio quality, was unduly suggestive.

The general rule in Tennessee concerning tape recordings is that the audibility of the tape goes to the weight of the evidence and not its admissibility. State v. Beasley, 699 S.W.2d 565, 569 (Tenn. Crim. App. 1985). The practice of submitting tape recordings and transcripts when properly authenticated by a person present or who monitored the conversation, has been approved. State v.

Smith, 656 S.W.2d 882, 888 (Tenn. Crim. App. 1983); State v. Jones, 598 S.W.2d 209, 223 (Tenn. 1980).

In the instant case, the trial court previewed the tape and observed that it was a "strain" to understand but admitted both the tape and transcript. We also have taken opportunity to listen to the tape and found it of poor quality, but not inaudible. The trial court took the further precaution upon admitting the evidence to instruct the jury as follows:

THE COURT: Okay. Let me mention to you, Members of the Jury, that you're going to be provided with transcripts that purports to be a transcription of the tape that you're going to be listening to. The actual evidence is the tape, which you'll be hearing. And – and frankly, the tape, some of it is difficult to hear. You have to, really, kind of strain to hear the tape. And I would say to you that, if there are differences from your listening to the tape, from what you're reading on the transcript, then you would rely on what you hear on the tape. The transcript is provided to you to aid you in listening to it, to read along with it, and so forth. And I might also add in– later, in the trial, in your deliberations, you'll be able to take this tape to the deliberation room if you need to listen to it better. This room, as the people have mentioned, kind of – the acoustics are not that great. And if you needed to hear it, again, you could. But I'm emphasizing that the tape is the evidence, not the transcript.

We conclude that the trial court properly admitted the evidence and gave an appropriate instruction that cautioned against any undue influence from the transcript.

## Aiding and Abetting Instruction

The defendant's final issue attributes error to the trial court in instructing the jury on the theory of aiding and abetting. The defendant contends that this instruction effectively lessened the State's burden of proof to establish his identity as the perpetrator of the murder.

A defendant has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted on proper instructions. State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000). In criminal cases, a trial court has a duty to fully instruct the jury on the general principles of law relevant to the issues raised by the evidence and the principles which are "closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." State v. Elder, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998).

Herein, the trial court acceded to the State's request for a jury instruction on aiding and abetting.[1] The defendant submits that, although the State's theory was that the defendant was the shooter, the aiding and abetting charge lessened the State's burden of proof in establishing the defendant as the actual gunman beyond a reasonable doubt. The State counters that because a positive identification of the gunman was not possible, the instruction was necessary to show a shared intent to murder would be equally culpable. Furthermore, the trial court gave an instruction that required the proof of the identity of the perpetrator beyond a reasonable doubt, whether as principal or an aider or abettor.

Upon review of the entire record and the respective instructions in this regard, we agree with the State and find no error concerning the aiding and abetting instruction.

### Conclusion

Having found no reversible error, we hereby affirm the conviction of the defendant for first degree premeditated murder.

_____
JOHN EVERETT WILLIAMS, JUDGE

---

[1] This offense occurred prior to the effective date of the Criminal Sentencing Reform Act of 1989; thus, the prior theory of aiding and abetting was applicable. It was subsumed into the theory of criminal responsibility. See Tenn. Code Ann. § 39-11-402.